United States Bankruptcy Court
Eastern District of Pennsylvania

In re:                                                                                      Case No. 25-11778-amc

    J McCloud Realty LLC,                                            Chapter 7

                              Debtor.

### Sadek Law Offices LLC's Motion to Reconsider
### Order Denying Fee Application, or in the Alternative, Amend Findings

**AND NOW**, Movant Sadek Law Offices LLC, former attorney to Debtor J McCloud Realty LLC, moves this Court under Fed. R. Bankr. P. 9023(b) to reconsider its order denying the Movant's application for compensation (Doc. 113), or, in the alternative, to amend the findings made on the record in support of that order.[1]

**I.     Background**

    **A.     Pre-Petition Events**

The Debtor is a Pennsylvania limited liability company that owned two residential properties in Philadelphia when this case was filed. (Doc. 11 at 1-2.) In May 2025, the Debtor requested that the Movant file a chapter 11 bankruptcy case to stay a May 6 sheriff's sale of both properties, which was initiated due to substantial mortgage arrearages. (Doc. 11 at 2-3; Doc. 77-2 at 60.) The Movant declined to do so because it believed that it was unlikely that the Debtor would be able to reorganize successfully, as it had few assets, little cash flow, and no significant operational

---

[1] For convenience, this pleading's references to "the Movant" will not distinguish between Sadek Law Offices LLC or attorneys Brad J. Sadek and Michael I. Assad. Similarly, references to "the Debtor" will not distinguish between J McCloud Realty LLC, its principal, Jamirah McCloud-Ford, or her mother, Khalilah Boyd.

structure. (Doc. 77-2 at 60.) Because the Debtor was persistent, the Movant suggested that the Debtor's principal file a chapter 13 bankruptcy instead because some lenders will voluntarily stay foreclosure proceedings when property is owned by a corporation and the sole member files for bankruptcy. (Doc. 77-2 at 15; Sep. 3 Hr'g Tr. at 3.) The Movant cautioned the Debtor that this strategy's likelihood of success was a coin toss, but that it was still a better option than filing a chapter 11 case. (Doc. 77-2 at 15.) The Movant charged the Debtor's principal $2,500 to file the chapter 13 case. (*Id.* at 7.)

Ultimately, the chapter 13 did not work because the lender would not stay the sale. (Doc. 77-2 at 15.) At that time, the Movant offered to refund $2,000 of the fees paid so that the Debtor could use the funds to pay another attorney if they were willing to file a chapter 11. (*Id.*) The Debtor declined the refund and insisted that the Movant file a chapter 11. (*Id.*) When the Movant again declined, the Debtor became belligerent, and over a two-hour period, repeatedly called the Movant's office and the personal mobile phone of one of its attorneys until the Movant agreed to file the case. (Doc. 60 at 1.) The Movant eventually relented and agreed to file the case. (Doc. 60 at 1.) Although it had reservations about the case, the Movant believed a positive outcome was possible, if unlikely, and made every effort to achieve that positive outcome. (*Id.*) The Debtor's principal paid the Movant a $10,000 retainer from personal funds, and the Movant applied a $2,000 credit from fees paid for the chapter 13 case. (Doc. 16-2 at 1.) The Debtor did not pay in full until just hours before the properties were to be sold at a sheriff's sale. (*Id.*)

### B. The First Two Days

The Movant initiated the case on behalf of the Debtor by filing a voluntary petition with the Court under subchapter V of chapter 11 on May 6, 2025. (Doc. 1.) The Debtor incurred pre-petition fees and costs of $5,205.50, which were billed against the retainer. (Doc. 16-2 at 1-2.) At

the time the case was filed, the Movant was holding $6,794.50 in trust. (Doc. 16-2 at 1-2.) Because the case was filed in an emergency, the schedules, statements, and other documents required by Fed. R. Bankr. P. 1007 were not filed with the petition. (Doc. 10; Jun. 25 Hr'g Tr. at 31.) The Court ordered that they be filed within fourteen days. (Doc. 10.) As a result of the bankruptcy, the sheriff's sales of the Debtor's properties were rescheduled for July 1. (May 14 Hr'g Tr. at 15-16.)

The Movant orally questioned the Debtor about its assets, liabilities, and other relevant matters necessary to determine appropriate post-filing steps. (Doc. 60 at 1-2; Doc. 77-2 at 15.) The Movant also provided the Debtor with a comprehensive written explanation of its obligations under chapter 11 of the Bankruptcy Code, including a list of documents and information that the Debtor was required to submit to the Movant. (Doc. 60 at 1; Doc. 77-1.) The documents requested included "[b]ank account statements for all accounts for the past 12 months, even if they are now closed;" "[c]opies of all security agreements, mortgages, and UCC-1 financing statements;" and "[c]urrent loan statements showing balances and payment history." (Doc. 77-1 at 3.)

> (5) Bank account statements for all accounts for the past 12 months, even if they are now closed.

*Letter from Movant to Debtor dated May 6, 2025. (Doc. 77-1 at 5.)*

The Movant also explained that "the Debtor may not use any 'cash collateral,' including generally, proceeds, products, offspring, rents and profits of property subject to security interests, without the secured creditor's consent or, if consent is refused, authorization of the bankruptcy court." (*Id.* at 7.)

> 3. **Use of Cash Collateral.** The Debtor may not use any "cash collateral," including generally, proceeds, products, offspring, rents and profits of property subject to security interests, without the secured creditor's consent or, if consent is refused, authorization of the bankruptcy court.

*Letter from Movant to Debtor dated May 6, 2025. (Doc. 77-1 at 7.)*

3

The Movant informed the Debtor that it would need to immediately open a bank account at an institution approved by the United States Trustee. (*Id*. at 1, 6.) The Debtor was warned that failure to comply with the Bankruptcy Code could result in dismissal of the case or conversion to chapter 7. (*Id*. at 8.)

In response to these inquires, the Debtor told the Movant that it had no obligations other than the mortgages owed to Philadelphia Federal Credit Union, its Mortgage Lender. (Doc. 77-2 at 15.) The Debtor also informed the Movant that the Debtor had no bank account and no cash on hand. (Doc. 77-2 at 16.) Because the Debtor had previously asked if they could pay the Movant's fees with a post-dated check (the Movant said no), the Movant had good reason to believe that the Debtor's statement about not having a bank account or cash on hand was accurate. (*Id*. at 7.)

### C.  The Mortgage Lender's Motion

Two days after the case was filed, the Mortgage Lender filed an emergency motion to prohibit use of cash collateral, which included a request for relief from the automatic stay. (Doc. 11.) Attached to the motion was a pre-petition assignment of rents agreement signed by the Debtor, which constituted cash collateral. (Doc. 11-3.) This was the first time the Movant learned about the assignments of rents; had it known, a motion to allow use of cash collateral would have been filed on the day the bankruptcy was filed. (Doc. 77-2.) The Debtor would later say, "I wasn't aware that I assigned rents to the bank when I signed my loan therefore I didn't keep that from you." (*Id*. at 6.) A few days later, the Debtor informed the Movant that it owed a debt to the U.S. Small Business Administration. (*Id*. at 16.) Like the rent assignment agreement, the SBA loan was not disclosed to the Movant when it had asked about the Debtor's obligations. (*Id*.) Thus began the slow drip of material information contradicting the Debtor's previous disclosures to the Movant.

4

The Mortgage Lender's hostility bled through its pleadings, which suggested that it had little appetite for an informal or consensual resolution. (*See* Doc. 11.) The Movant's strategy to defend the Debtor against stay relief was to file an objection to the motion along with a proposed order that would have allowed the use of cash collateral. (Doc. 14.) To demonstrate the seriousness of the case, the Movant prepared and filed a chapter 11 plan. (Doc. 13.) Ultimately, the Debtor's evasiveness left the Movant with no good options for defending the Debtor against stay relief. (*See* Doc. 60; Sep. 3 Hr'g Tr. at 11.)

### D.   The May 14 Hearing

The Movant represented the Debtor at a hearing on May 14, 2025, which was scheduled on an expedited basis to hear the Mortgage Lender's motion for relief from the automatic stay. (Doc. 15.) At the hearing, the Court began by expressing its concern that cash collateral was being used without its permission. (May 14 Hr'g Tr. at 4.) In response, the Movant explained his understanding that no cash collateral had been used because the Debtor did not have funds on hand when the case was filed and had not collected funds since the case was filed. (*Id.* at 4-5.) When the Court asked the Movant if it had seen the Debtor's bank account activity to verify no cash had been used, the Movant responded that the Debtor did not have a bank account. (*Id.* at 5.) The Court expressed skepticism that the Debtor did not actually have a bank account, stating, "I'm not sure if it's the Debtor's bad faith or maybe you just weren't familiar enough [with chapter 11] to know that these were the questions you needed to ask." (*Id.* at 7.)

The Court continued the hearing to the next week for the Movant to discuss these concerns with the Debtor before deciding whether it would enter an order granting relief from the stay. (*Id.* at 8.) The Court added that it would entertain an expedited motion to dismiss at that time, if any party in interest chose to file one. (*Id.* at 8.) The Court also suggested that the Debtor "may[] want

5

to voluntarily dismiss the case until you get all your ducks in line . . ." (*Id.* at 9.) After the hearing, the Court entered an order prohibiting the Debtor from using cash collateral. (Doc. 32.)

That same day, the U.S. Trustee moved to dismiss or convert the case to chapter 7 on the basis that the Debtor had "gross[ly] mismanage[d]" its business by not maintaining a bank account. (Doc. 30 at 4.)

### E.     The Debtor's Reaction

The Movant told the Debtor what happened at the hearing, explained its professional opinion that it was virtually certain that the bankruptcy case would be dismissed or converted, and urged the Debtor to consent to voluntary dismissal. (Doc. 77-2 at 1.) When the Movant explained to the Debtor that its lack of a pre-petition bank account was a major source of the Court's concern, the Debtor lied and said that it actually did have a bank account. (*Id.* at 2.) It was later confirmed by the Debtor's financial institution that its bank account was closed in July 2022, well before this case was filed in May 2025. (Doc. 75 at 2.)

The Debtor strongly opposed dismissal of the case and ordered the Movant to defend against the motion. (Doc. 77-2 at 6.) The Movant warned the Debtor that the longer it took to consent to dismissal, the more likely a conversion to chapter 7 was. (*Id.* at 1.) The Debtor and the Movant went back and forth for several days, with the Movant continually explaining how dismissal was in the Debtor's best interest. (*Id.* at 7.) During this time, the Movant expressed concern to the Debtor that its stories were not adding up and urged them to be more forthcoming. (*Id.* at 3, 5.) In response, the Debtor baselessly alleged that this was all the Movant's fault. (*Id.* at 13.) The Debtor also said that the case moving forward was necessary to prevent "evil [from] prevail[ing]." (*Id.* at 10.)

Ultimately, the Movant informed the Debtor that it would appear at the continued hearing and represent to the Court that, as an officer of the Court, there was no defense to the motion to dismiss warranted by law. (*Id.* at 7.) The Movant also informed the Debtor that it could retain a different attorney. (*Id.* at 7.) The Movant stressed that until it was replaced as the Debtor's attorney or the case was dismissed, it would continue to offer every defense allowed by law. (*Id.* at 9.)

After much back and forth, the Debtor finally informed the Movant on May 20 that it consented to dismissal. (*Id.* at 13.) Because Mr. Assad was caring for his daughter, who was born unexpectedly the day before, he did not see the Debtor's email in time to file a voluntary motion to dismiss before the hearing.[2] (Doc. 77 at 2.)

### F.    The May 21 Hearing

The Movant appeared on the Debtor's behalf at the May 21, 2025, hearing to consider the Mortgage Lender's motion for relief from the automatic stay and the U.S. Trustee's motion for dismissal or conversion. (May 21 Hr'g Tr. at 1.) Although the Movant informed the Debtor of the hearing and provided Zoom connection information, the Debtor did not appear. (Doc. 77-2 at 7; May 21 Hr'g Tr. at 1.)

At the hearing, the U.S. Trustee pressed for conversion of the case, because "what we have here is the unknown," and "the stuff [we] do know is all bad." (May 21 Hr'g Tr. at 4, 5.) The Mortgage Lender pressed its motion for relief. (*Id.* at 6.) On the Debtor's behalf, the Movant stated the Debtor's consent to dismissal and urged the Court against conversion. (*Id.* at 5.) The Court

---

[2] Voluntary motions to dismiss in chapter 11 cases are heard after notice and hearing, so the Debtor was not prejudiced by the lack of a written motion because it would not have been heard before the U.S. Trustee motion, and because the Movant stated the Debtor's consent to dismissal on the record at that hearing. *See* Local Bankr. R. 1017-2(b).

7

granted the motion for relief and converted the case to chapter 7 because "there's just some very weird facts flying around." (*Id.* at 7.)

All told, the hearing lasted less than five minutes. (*Id.* at 3, 8.)

### G.    The Movant Withdraws as the Debtor's Attorney

After the hearing, the Movant moved to withdraw as the Debtor's attorney.

> Throughout its representation, the Movant has advised the Debtor in good faith and in accordance with its experience and knowledge of the Bankruptcy Code. Despite the Movant's efforts, the Debtor has been hostile, uncooperative, and has disregarded the Movant's legal advice. The Debtor's conduct has made continued representation unreasonably difficult, obstructed the proper administration of this case, and caused the case to be converted to chapter 7.

(Doc. 44.) The Debtor filed a written objection to the motion to withdraw, and the Movant filed a declaration in response that further explained the reasons for withdrawing.

> I cannot ethically or effectively continue representation of the Debtor under these circumstances, for several reasons.
>
> First, I cannot fulfill my professional obligations to a client that is not forthcoming. I must be able to rely on the completeness and accuracy of the information provided by my client to prepare required filings, effectively advocate for their interests before the Court, and facilitate compliance with the Bankruptcy Code.
>
> Second, the Debtor insists on pursuing appeals from the Court's orders granting relief from the automatic stay and converting this case to chapter 7. In my professional judgment, an appeal of the relief order cannot be supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law. Although the Debtor may have grounds to appeal the conversion order, such an appeal would be futile, as reconversion to chapter 11 would not reinstate the automatic stay or prevent the sale of the Debtor's properties.
>
> Finally, as an attorney, I am only able to help clients who are willing to be guided by my legal advice. The Debtor's principal has

8

> consistently ignored my legal advice and has become hostile, even belligerent, when I provide advice that she does not wish to hear.

(Doc. 60 at 2.) To preserve the Debtor's rights, the Movant filed a motion to extend the time to appeal those orders in case the Debtor found a lawyer who would do so. (Doc. 77-2 at 22.) The Court granted the extension as to the conversion order but denied the extension as to the relief order because an extension was not allowed under the rules. (Jun. 25 Hr'g Tr. at 4.) The Movant later admitted error in not knowing that the appeal period for stay relief orders could not be extended. (*Id.* at 4.) Even so, this did not prejudice the Debtor, because the Movant's obligations under Fed. R. Bankr. P. 9011 would have prevented the Movant from filing an appeal to the stay relief order nonetheless. (*Id.* at 9.)

### H.   The June 11 Hearing

The Court held a hearing on June 11, 2025, to consider the Movant's motion. Jamirah McCloud-Ford, the Debtor's principal, and her mother, Khalilah Boyd, appeared at the hearing, and made a series of slanderous allegations against the Movant, including that it "work[ed] with the opposal [sic] counsel" against the Debtor's interests. (Jun. 11 Hr'g Tr. at 2, 9.)

The Court granted the Movant's motion to withdraw as attorney. (Doc. 63.) After the Court made its ruling, the Debtor persistently badgered the Court to disgorge the Movant's fees, but the Court explained to the Debtor that the only matter before it was the motion to withdraw as attorney. (*Id.* at 10.) The Court suggested that the Debtor file a *pro se* motion to request further relief. (*Id.* at 13.) When the Debtor reminded the Court that corporations are not permitted to appear *pro se*, the Court said, "Oh, yeah, that's right." (*Id.* at 13.) When the Debtor expressed frustration that they were stuck in the bankruptcy case without representation, the Court suggested that they "maybe

9

talk to the Chapter 7 Trustee and see if . . . the Chapter 7 Trustee might be willing to dismiss your case . . ." (*Id.* at 16.)

### I. The June 25 Hearing

On June 13, 2025, the Debtor filed two pleadings. The first was captioned as a "Motion for Reconsideration of Relief from Stay Under FRBP 9024 (F.R.C.P. 60(b))," and the second was captioned as a "Motion for Reconsideration, Objection to Attorney Compensation, Request for Conversion to Chapter 11, or, in the Alternative, Dismissal of Chapter 7; and Motion for Sanctions Due to Attorney Misconduct." (Doc. 66, 67.) Both pleadings were signed only by the Debtor's principal, who is not an attorney, and mostly consisted of baseless diatribes against the Movant. (*Id.*) One of the pleadings purported to provide "proof" that the Debtor had an active bank account, but it was obviously just a loan statement. (Doc. 67-1 at 25.)

> **Dear Member,**
>
> Your May 2025 Billing Statement (paperless statement)* is now available on Teller Net at Pfcu.com.
>
> Simply log in, select the "eServices" menu item then "eStatement" to review and print your Billing Statement.
>
> Here is your summary for loan ***355 L102:
>
> - Loan Payment Due Date: 6/01/24
> - Balance Before Payment: $146,420.38
> - Total Payment Due: $16,805.38

*The Debtor's "proof" of a bank account. (Doc. 67-1 at 25.)*

On June 25, 2025, the Court held a hearing on both motions. The Debtor appeared with attorney James McGarrity, but Mr. McGarrity did not enter his appearance and was only present so that the Debtor could participate in the hearing despite not being represented by an attorney.

10

( Jun. 25 Hr'g Tr. at 2.) The Debtor's principal and her mother, who are not attorneys, did most of the talking on behalf of the Debtor. (*See* Jun. 25 Hr'g Tr.)

The Court told the Debtor that it "was greatly dismayed . . . that the Debtor didn't have bank accounts, which is something that I haven't ever encountered in my entire legal career. And so as a result of my concerns, I did grant the motion for relief from the stay and I did enter an order converting this case to a Chapter 7." ( Jun. 25 Hr'g Tr. at 4.) The Court listened to the Debtor make its argument, but it was unmoved.

> I don't see anything here that would give me a basis to grant a motion for reconsideration. I don't see any change in controlling law or new facts that weren't available at that time or manifest injustice. I understand that there's some disagreement between the Debtor and her prior attorney, but I just don't see manifest injustice . . . . I don't have a legal basis to grant your motion for reconsideration of either of these matters, unfortunately for you. So I am going to deny those motions.

(*Id.* at 6-8.) The Debtor pushed back, but the Court held firm in its decision. (*Id.* at 8-11.) When it became clear the hearing was not going in its favor, the Debtor became very angry and started ranting uncontrollably.[3] (*Id.* at 13-14.) In reaction to the Debtor's belligerent behavior, the Court began to look for ways to appease the Debtor. Although the Mortgage Lender told the Court both at the hearing and in its written objection that the Debtor's bank account was closed in July 2022, and although the Movant told the Court it questioned the Debtor about the existence of bank accounts orally and in writing, the Court suddenly and inexplicably decided that the Debtor must have had a bank account, and that it was not disclosed because of what the Court perceived as the Movant's inexperience. ( Jun. 25 Hr'g Tr. at 15, 40-41; Doc. 75 at 2; Doc. 77 at 2; Doc. 77-1 at 5.)

---

[3] The Movant encourages the Court to listen to the Clerk's audio recording of this hearing to refresh its memory of how belligerent the Debtor became at this point.

11

The Court then stated that, if the Debtor made a post-petition mortgage payment before July 23, it would consider vacating both the conversion and stay relief orders. (Jun. 25 Hr'g Tr. at 21-23.) The Court's impulsive change in direction was especially bizarre considering that the Mortgage Lender never raised post-petition payment arrears as grounds for relief, and because the case was only pending for two weeks when stay relief was granted. (*See* Doc. 11.)

The hearing ended with the Court ordering the Mortgage Lender to stay the pending sheriff's sales of the Debtor's properties to give the Debtor time to hire an attorney, file schedules, and make post-petition payment to the Mortgage Lender. (Jun. 25 Hr'g Tr. at 24, 32-33.)

### J.      The July 29 Hearing

The Court continued the reconsideration motion hearing to July 29, 2025. Shortly before the hearing, the Debtor filed self-prepared schedules and a statement of financial affairs, which stated that the Debtor did not have any cash, cash equivalents, or bank accounts when the case was filed. (Doc. 89 at 29.)



*The Debtor's Schedule A/B reflecting no cash or bank accounts. (Doc. 89 at 29.)*

At the hearing, the Debtor's principal and her mother appeared on the Debtor's behalf, without an attorney. (Jul. 29 Hr'g Tr. at 2.) The Debtor reported to the Court that it was unable to find an attorney willing to take the case and illogically blamed that on the Movant. (*Id.* at 4-5, 14.)

12

The Mortgage Lender reported that the Debtor made the post-petition payment, but that it was not sent from a corporate bank account. (*Id.* at 3.) In any event, the Court informed the Debtor that it would deny the motion to reconsider because the Debtor was unable to retain a new attorney. (*Id.* at 6.) In response, the Debtor became so belligerent that the Court asked a deputy clerk to mute her microphone. (*Id.* at 16.)

### K.    The August 4 Hearing

The Debtor moved to dismiss the case on July 29, 2025. (Doc. 95 at 3-5.) Like the Debtor's other pleadings, it was signed only by the Debtor's principal, who is not an attorney. (*Id.*) The next day, the Court scheduled a hearing to consider the motion on August 4. (Doc. 97.) On August 3, 2025, attorney Maggie Soboleski entered her appearance as the Debtor's attorney. (Doc. 104.) At the hearing, Ms. Soboleski requested that the Court either dismiss the case or convert it back to chapter 11 and reinstate the automatic stay. (Aug. 4 Hr'g Tr. at 3.) Because the chapter 7 trustee stated that he did not object to dismissal, the Court granted the motion to dismiss. (*Id.* at 5.)

After the Court made its ruling and concluded the hearing, the Debtor engaged in direct colloquy with the Court, demanding that the case be reconverted to chapter 11. (*Id.* at 5-6.) The Court suggested that the Debtor consult with Ms. Soboleski as to the Debtor's options moving forward, and concluded the hearing a second time. (*Id.* at 7-8.) But the Debtor continued to badger the Court, demanding that sanctions be entered against the Movant. (*Id.* at 8.) The Court informed the Debtor that a hearing to consider the Movant's fee application and any sanctions would be heard on September 3, 2025. (*Id.* at 9-10.) The Court then concluded the hearing a third time. (*Id.* at 10.) Even still, the Debtor did not relent and continued to badger the Court in protest. (*Id.*) The Court told the Debtor there was nothing more it could do and concluded the hearing a fourth time. (*Id.*) The next day, both properties were sold at a sheriff's sale. (*Id.* at 6.)

13

### L.   The September 3 Hearing

Before the case was dismissed, the Court, at the Movant's request, entered an order retaining jurisdiction over the Movant's fee application. (Doc. 85.) The application requested permission to apply the $6,794.50 retainer balance it was holding in trust to the post-petition fees the Debtor incurred before the Movant withdrew as its attorney. (Doc. 57.)

A hearing on the application was held on September 3, 2025. The Debtor's principal and her mother appeared at the hearing without an attorney and objected to the application on the Debtor's behalf. (Sep. 3 Hr'g Tr. at 2.) The Court denied the fee application based on three erroneous findings. First, the Court erroneously found that the Movant did not adequately question the Debtor about its assets and liabilities due to a lack of experience representing commercial debtors. (*Id.* at 7.) Second, the Court erroneously found that the Movant's representation caused the Debtor to lose its properties at sheriff's sale. (*Id.* at 8.) Third, the Court erroneously found that the Movant caused this case to be "a complete free-for-all." (*Id.*)

## II.   Legal Standard

A motion to reconsider is appropriate when necessary to "correct manifest errors of law or fact . . ." *In re Marinari*, 596 B.R. 809, 816 (Bankr. E.D. Pa.), *aff'd*, 610 B.R. 87 (E.D. Pa. 2019), *aff'd*, 838 F. App'x 709 (3d Cir. 2021) (citing *Fountain v. Vaughn*, 679 F. App'x 117, 119 (3d Cir. 2017)). To prevail, a party must show "the need to correct a clear error of law or fact or prevent manifest injustice." *Id.* (citing *Degussa v. Materia*, 305 F. Supp. 3d 563, 575 (D. Del. 2018) (citations omitted)). Because reconsideration is an "extraordinary remedy," the movant must show extraordinary entitlement to relief. *Id.* (citing *In re Sellers*, 555 B.R. 479, 481-82 (Bankr. E.D. Pa. 2016)). The standard for motions to amend a Court's findings is practically the same. *Id.* at 19.

14

A clear error of law or fact occurs when a court overlooks an issue that could have changed its decision. *Id.* (citing *Einhorn v. Kaleck Bros.*, 713 F. Supp. 2d 417, 426 (D.N.J. 2010)). To reconsider does not mean to rethink—it means to revisit a decision when "dispositive factual matters . . . were presented to the court but were overlooked." *Einhorn*, 713 F. Supp. 2d at 427 (citing *Buffa v. New Jersey State Dept. of Judiciary*, 56 Fed. Appx. 571, 575 (3d Cir.2003)) (quotation marks omitted). It is not enough that something was overlooked; a movant must show that the overlooked matter "might reasonably have resulted in a different conclusion." *Marinari*, 596 B.R. at 818 (quoting *In re Leahey*, 2017 WL 4286136, at *2 (Bankr. D. N.J. Sept. 26, 2017)).

This burden requires a movant to demonstrate that a court's holding has no basis in the record, or that it "would result in 'manifest injustice' if not addressed." *ABS Brokerage Servs. v. Penson Fin. Servs.*, 2010 WL 3257992, at *6 (D.N.J. Aug. 16, 2010); *see also United States v. Grape*, 549 F.3d 591, 603–604 (3d Cir. 2008).

### III. Argument

At least three of the Court's findings are not supported by the record: that the Movant failed to inquire about bank accounts or counsel the Debtor on cash collateral; that the Movant's representation caused the sheriff's sales; and that the Movant made the case "a complete free-for-all." Each is a clear factual error that warrants reconsideration or, at minimum, amended findings to prevent manifest injustice.

*[This space intentionally left blank.]*

### A. Based on the record, the Court's finding that the Movant did not inquire about the Debtor's bank account or counsel the Debtor about cash collateral is clearly erroneous.

The Court's conclusion that the Movant did not ask about bank accounts or advise on cash collateral is based on imagination, not the record. Jun. 25 Hr'g Tr. at 40–41 ("I can't imagine that [the Debtor] would lie to you and say that they don't have bank accounts."). It is bizarre that the Court thinks the Debtor would not lie to the Movant, when the record shows the Debtor lies repeatedly. The Debtor first claimed to have no bank account, then claimed to have a bank account, then claimed to have cash sitting in a safe, then filed schedules showing no cash on hand and no bank account.

The record shows what actually happened. On May 6, the Movant delivered a detailed written advisory instructing the Debtor to open a DIP account at a U.S. Trustee-approved bank and expressly warning that the Debtor "may not use any cash collateral . . . without the secured creditor's consent or . . . Court authorization." The Movant also orally questioned the Debtor about assets and liabilities. The Debtor responded that it had no bank account, no cash, and only the mortgage lender as a creditor. Those representations later proved false: the lender confirmed the Debtor's bank account had been closed since July 2022, and the Debtor's supposed "proof" of an account was merely a loan statement.

Further, the record does not support any inference of the Movant's inexperience. Two days before filing this case, the Movant filed *In re Erie Kash Out Properties LLC*, No. 25-11729-amc, another closely held real-estate debtor seeking to cure mortgage and SBA loan arrears. Doc. 77 at 1-2. **In that case, the Movant negotiated a cash-collateral arrangement with two lenders, which this very Court approved**; timely filed all schedules and statements; and defeated a motion to dismiss/convert. *Id.* That case is on track to plan confirmation, which would be the Movant's

third confirmed chapter 11 case. *Id*. The record and the Movant's experience contradicts the premise that the Movant failed to ask the right questions or to advise on cash collateral. It also contradicts the Court's finding that the Movant "didn't understand the importance of filing a motion to use cash collateral," and "[wasn't] prepared to sit [the Debtor] down and tell them about all the first day motions that had to be filed in this case." Sept. 3 Hr'g Tr. at 7.

For these reasons, the finding that the Movant failed to ask about the Debtor's bank account or to advise the Debtor on cash collateral is a clear factual error that drove the Court's ruling. To prevent manifest injustice, the Court must reconsider and amend its findings to reflect what the record shows—that the Movant asked, advised, and was misled by the Debtor.

### B.    Based on the record, the Court's finding that the Debtor's properties were sold at sheriff's sale as a result of the Movant's representation is clearly erroneous.

The record shows that the sheriff's sales resulted from the Debtor's default on its obligations, its concealment and misstatements, and the Mortgage Lender's unwillingness to compromise. The properties were not lost because of anything the Movant did or failed to do. Had this case never been filed, the properties would have been sold at sheriff's sales on May 7 instead of August 5.

For these reasons, attributing the sheriff's sales to the Movant's representation is unsupported by the record and is clear error. The Court must reconsider or amend its findings to remove any causal attribution to the Movant.

*[This space intentionally left blank.]*

### C. Based on the record, the Court's finding that the Movant caused this case to be "a complete free-for-all" is clearly erroneous.

The Court's description of this case as "a complete free-for-all" stems from the Court's laissez-faire approach to presiding over this case, not anything the Movant did.

First, this case should have been dismissed on May 21. But the Court repeatedly declined to dismiss the case said it would only do so if the U.S. Trustee did not object. Rather than making a record-based discretionary decision, the Court effectively delegated its independent duty to exercise judgment to a party in interest. The Court's discretion does not give it the prerogative to be a rubber stamp for the U.S. Trustee or the interim trustee. *See In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008). In this case, the Court's deference went so far that an uninformed observer would think the Court did not have a say in the matter. Jun. 11 Hr'g Tr. at 16 ("[M]aybe talk to the Chapter 7 Trustee and see if . . . the Chapter 7 Trustee might be willing to dismiss your case . . ."); Jun. 25 Hr'g Tr. at 40 ("[I]f the U.S. Trustee changes their position and they're willing to dismiss the case . . . just let me know . . .")

Second, the Court impulsively converted the case to chapter 7 within two weeks of filing, and later expressly acknowledged that the Debtor had not been afforded a full opportunity to proceed in chapter 11. Jun. 25 Hr'g Tr. at 36. The conversion lacked evidentiary support and rested entirely on the U.S. Trustee's generalized suspicion about the "unknown." Instead, the Court should have allowed the U.S.T. to investigate the Debtor's finances without immediate conversion or stay relief. It could have put the Debtor on a short leash and monitored the case in chapter 11 and then granted conversion or stay relief if evidence supported such remedies. Instead, by short-circuiting these steps, the Court created the instability it later blamed on the Movant.

18

Finally, the Court caused procedural havoc by repeatedly entertaining incoherent filings and oral argument from the Debtor's principal and her mother, neither of whom is an attorney. In doing so, the Court discarded hundreds of years of binding jurisprudence and violated the Code of Conduct for United States Judges. *Rowland v. California Men's Colony*, 506 U.S. 194, 201-02, (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel.") (citations omitted); *Simbraw v. United States*, 367 F. 2d 373 (3d Cir. 1966); *MicroBilt Corp. v. Bail Integrity Sols.*, 2022 WL 2910462 (D. N.J. July 21, 2022); *Code of Conduct for United States Judges*, Canon 2A, 3A (Judicial Conf. of the U.S. 2019). The record suggests that this error was driven by an effort to placate a belligerent debtor who repeatedly disrupted proceedings. Ironically, the Movant filed the case at the Debtor's insistence in a similarly desperate effort of appeasement. Given that context, the Court should have been more understanding of the Movant's position.

For these reasons, the "complete free-for-all" characterization is not based on the record. It is clear error and, if left intact, will cause manifest injustice. The Court must reconsider or amend its findings to strike that characterization.

## IV.   Conclusion

The Court's findings are not based on the record. They are careless and unfairly expose the Movant to an unwarranted risk of professional liability and disciplinary action. For those reasons, the Movant demands that the Court either reconsider the order denying the fee application or amend its findings to accurately reflect the Movant's lack of culpability.

19

Date: September 18, 2025  **SADEK LAW OFFICES LLC**

By: /s/ Michael I. Assad
Michael I. Assad (#330937)
1500 JFK Blvd., Suite 220
Philadelphia, PA 19102
215-545-0008
michael@sadeklaw.com

20